**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**EMBRAER, S.A.**

**Defendant.**

---

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges:

<u>**SUMMARY**</u>

1.       This action arises from violations of the Foreign Corrupt Practices Act ("FCPA") by Embraer S.A. ("Embraer" or the "Company"), a global aircraft manufacturer for the commercial, defense, and executive jets markets.

2.       Between at least May 2008 and February 2011, Embraer paid bribes through its U.S.-based subsidiary to foreign government officials in the Dominican Republic, Saudi Arabia, and Mozambique to obtain business.  Embraer realized over $83 million in profits from business obtained through the use of illicit payments.

3.       These bribes were authorized by senior executives at Embraer and its subsidiaries while knowing or recklessly ignoring red flags which indicated a high probability that such payments were intended for, or would be passed to, foreign officials.

4.       Embraer created false books and records to conceal the authorization of least three bribe payments to at least one government official in the Dominican Republic and another two

1

bribe payments to a government official in Saudi Arabia.  Embraer also created false books and records to conceal two bribe payments to a government official in the government of Mozambique.  These payments were remitted from a New York-based bank account held in the name of Embraer's U.S. subsidiary and paid through intermediaries from as early as April 2009 until at least February 2011.

5.      These payments were improperly recorded as legitimate expenses in Embraer's U.S. subsidiary's books and records and were consolidated into Embraer's financial statements. Embraer's internal accounting controls were inadequate because they failed to prevent such payments or detect red flags which should have alerted its employees that these payments, in whole or in part, were bribes to foreign government officials.  Moreover, the internal controls were circumvented to allow employees to authorize payments to third parties that were illegal in the host country, authorized with little or no supporting documents, or concealed through unrelated business transactions in an effort to avoid detection.

6.      Additionally, from January 2005 through November 2009, Embraer, through its employees, improperly booked large payments to an agent, and concealed its relationship with this agent, while trying to obtain business in India.   Embraer, through its employees, went to great lengths to conceal the existence of the agreement with its agent in India and falsely recorded a payment to this agent in order to conceal the true nature of the payment, which Embraer employees believed were in violation of Indian law, under a different contract serviced in another country which did not, in reasonable detail, accurately and fairly reflect its payments to this agent.

7.      As a result of its conduct in the Dominican Republic, Saudi Arabia, and Mozambique, Embraer violated Section 30A of the Securities Exchange Act of 1934 ("Exchange

Act") [15 U.S.C. § 78dd-1] when it authorized or paid bribes to foreign officials in order to obtain or retain business.  Embraer violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] when it created false books and records to conceal the authorization of bribe payments in the Dominican Republic, Saudi Arabia, and Mozambique and to conceal payments to an agent in India.  Embraer also violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] by failing to have sufficient internal accounting controls in place to detect and prevent the authorization or payment of bribes in the Dominican Republic, Saudi Arabia, and Mozambique, and detect and prevent the authorization or payment to an agent in India that Embraer employees had reason to believe was illegal.

8.      Embraer is reasonably likely, unless restrained and enjoined, to continue to engage in the acts and practices set forth in this complaint, and in acts and practices of similar purport and object.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.      Embraer, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  Further, Embraer has consented to venue in this Court.

## DEFENDANT

11.      **Embraer S.A.** is a Brazilian company incorporated and headquartered in São Paulo, Brazil, with its North American regional office located in Fort Lauderdale, Florida.  It is the world's largest manufacturer of mid-size commercial jets and a leading Brazilian exporter.

Embraer supplies defense aircraft for the Brazilian Air Force and other countries throughout Africa, Asia, Europe, and Latin America.  It also manufactures executive jets and regional aircraft and offers aviation services.  In 2015, Embraer employed over 22,000 employees worldwide and had revenues just under $6 billion.  Throughout the relevant time period, Embraer's common shares were registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l] and traded in the form of American Depositary Shares that were represented by American Depositary Receipts listed on the NYSE.

12.     As such, Embraer was required to file reports, including Form 20-F, with the Commission pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m] and related rules thereunder, and was an "issuer" within the meaning of the FCPA [15 U.S.C. § 78dd-1].

## RELATED ENTITIES

13.     **Embraer Representations LLC ("Embraer RL")** is a wholly-owned Embraer subsidiary formed in Delaware.  Embraer RL's financial statements are consolidated into the financial statements of Embraer at the parent level.  Embraer RL held and maintained the bank account in New York that transacted the improper payments during the relevant time period.

14.     **ECC Investment Switzerland AG ("Embraer AG")** is a wholly-owned subsidiary of Embraer based in Switzerland.  Embraer AG's financial statements are consolidated into the financial statements of Embraer at the parent level.

## FACTUAL ALLEGATIONS

### A.     Embraer's Illegal Payments in the Dominican Republic

15.     From August 2008 through at least October 2010, Embraer, through its employees and agents, agreed to pay, and did pay, $3.52 million to an official of the government of the Dominican Republic to obtain a defense contract valued at approximately $96.4 million.

4

16.     Beginning in 2007, employees at Embraer began efforts to sell the Super Tucano aircraft, a turbine driven propeller military aircraft typically used for border missions to fight drug trafficking, counter-insurgency missions, and training, to the Fuerza Aérea de República Dominicana ("FAD"), the Dominican Republic's air force.  Embraer employees negotiated directly with representatives from the Dominican armed forces, including a now retired Dominican air force colonel ("Dominican Official") who was a close associate to the then-Secretary of the Armed Forces for the Dominican Republic.  There was never a public bid or tender for this contract.

17.     During the relevant time period, the Dominican Official, who acted as the government's primary point of contact during the negotiations with Embraer, was a military or government official of the Dominican Republic.  Embraer employees internally referred to him as the General Manager or Managing Director of the Project as early as May 2007.  The Dominican Official also held himself out as the "Director of Programs and Projects FAD," and was later appointed by special decree as the General Manager/Managing Director of Projects and Programs to the Secretary of the Armed Forces of the Dominican Republic.

18.     By mid-2008, many of the terms of the Super Tucano contract were negotiated.  However, the legislature of the government of the Dominican Republic still had to approve the financing terms and the purchase agreement for this contract.

19.     On or about August 25, 2008, just before the Dominican Senate Finance Committee approved the project's financing, the Dominican Official requested that Embraer pay him a commission.  The Dominican Official told at least one Embraer employee that he was talking to a Dominican senator about "PLR$," which was a reference to profit sharing.  This information was forwarded to a senior Embraer executive at the time.

5

20.     Later emails to, from, or between the Dominican Official and Embraer employees indicate that the Dominican Official proposed that three Dominican companies receive a distribution of the commission that he requested.  These entities had not rendered any services to Embraer and were until then unknown to Embraer and its employees.  In September 2008, a senior Embraer sales executive agreed to pay the Dominican Official about 3.7% of the $96.4 million contract value, or approximately $3.52 million, to be distributed as follows:

a)   "Dominican Agent A" ($100,000);

b)   "Dominican Agent B" ($920,000); and,

c)   "Dominican Agent C" ($2.5 million).

21.     Embraer, through its employees, did not conduct adequate diligence on Dominican Agents A, B, and C, and payments to these agents were not based on any legitimate services these agents rendered to Embraer.  The Dominican Official even questioned at least one Embraer employee about whether Embraer would take seriously the information contained in the consulting agreements because, as he explained, the executors of the agreements would not have the sufficient background or knowledge to provide the information requested.

22.     On or around September 16, 2008, the Dominican Senate approved the project's financing, a critical step in the approval process.  Meanwhile, Embraer employees continued to discuss how to handle the commissions that the Dominican Official requested.  Embraer's internal policies and procedures permitted the use of third party agents for the sale of military aircraft.  However, Embraer's legal department viewed consulting agreements that were signed after the execution of a sales contract as "high risk."

23.     On September 17, 2008, a senior Embraer sales executive sent an email to another senior Embraer executive in the Defense and Government Markets division requesting that he

ask a senior Embraer legal executive to "find a solution" for the consulting agreements the Dominican Official submitted.

24.     In December 2008, Embraer mailed official correspondence relating the sales contract to the Dominican Official at his office located within the office of the Secretary for the Armed Forces of the Dominican Republic.  The government of the Dominican Republic approved the sale and financing for eight Super Tucano aircraft on or around December 24, 2008.

25.     On December 30, 2008, the Dominican Official was formally designated General Manager/Managing Director of Projects and Programs to the Secretary of the Armed Forces by special decree.

26.     On January 9, 2009, Embraer publicly announced the sale of eight Super Tucano aircraft to the government of the Dominican Republic for approximately $96.4 million.  At this time, however, Embraer had not yet remitted to the Dominican Official the commission that he requested, for himself or on behalf of others, in part because some Embraer employees raised questions about the sales commission and sought guidance from senior Embraer executives, including employees in Embraer's legal department, about how to proceed.  Rather than terminate the promise to pay the Dominican Official, senior executives at Embraer merely instructed subordinates to find a solution that did not involve the legal department.

27.     On April 24, 2009, Embraer RL wired $100,000 from its Citibank account in New York, New York to a bank account in the Dominican Republic belonging to Dominican Agent A. An Embraer contract manager authorized the $100,000 payment because the amount remitted was within his discretionary financial amount (up to $100,000) according to the Company's policies and procedures and did not require further approval from the legal department.  As of

the time of this payment, Embraer had not executed a formal, written consulting agreement with Dominican Agent A.

28.     The $100,000 from Embraer RL to Dominican Agent A was recorded at Embraer RL as "Consulting Fees" and consolidated at the parent level under Operating Income (Expense) as a "Selling Expense," specifically, "Commercialization Expense."

29.     Thereafter, a senior Embraer sales executive and others met with at least one senior Embraer legal executive to find a solution amid growing pressure from the Dominican Official and general discontent from other officials in the government of the Dominican Republic.  At the time, Company emails indicate that a senior Embraer legal executive suggested to other employees that they use a fourth agent, "Dominican Agent D," as a means to make the payments the Dominican Official requested or otherwise "complete the loop."

30.     On or around February 3, 2010, a senior Embraer manager indicated in an internal email that a senior Embraer legal executive was in favor of using a consulting agreement with Dominican Agent D as a conduit to remit the remaining sum owed to the Dominican Official.  At or about this time, a senior Embraer sales executive, Dominican Agent D, and the Dominican Official exchanged several emails discussing the roles each would play in resolving the matter. These emails described the Dominican Official as the interface between two groups in the Dominican Republic involved in obtaining the Super Tucano contract.  Dominican Agent D was described as the "bridge" between Embraer and the Dominican Official.

31.     As a result, Embraer decided to funnel the bribe payments to the Dominican Official by entering into a consulting agreement with Dominican Agent D.  On March 12, 2010, Embraer RL and Dominican Agent D executed a consulting agreement to promote the sale of Embraer aircraft in Jordan.  Embraer RL agreed to pay Dominican Agent D 8% of the total value

of any contract obtained in Jordan as a commission for services.  In addition, Dominican Agent D's consulting agreement required Embraer RL to remit an advance lump sum payment of $3.42 million (the outstanding amount promised to the Dominican Official).  A contract to sell aircraft in Jordan was never awarded to Embraer, and therefore paying Dominican Agent D an advance lump sum payment of $3.42 million was a way to pay the Dominican Official while camouflaging in Embraer's books and records that it involved a contract in the Dominican Republic.  A senior Embraer legal executive at the time signed Dominican Agent D's agreement on behalf of Embraer RL.

32.     On April 6, 2010, Dominican Agent D delivered to Embraer RL (c/o Embraer in Brazil) two false invoices, one for $920,000 and the other for $2.5 million.  The invoices stated that the amount owed for each invoice was for sales promotion services rendered under the contract to promote sales in Jordan.  The internal Embraer memorandum dated April 22, 2010, however, indicated that the lump sum payments were related to the Super Tucano aircraft sold to the government of the Dominican Republic.  Dominican Agent D never sold any aircraft in Jordan on behalf of Embraer pursuant to the March 12, 2010, consulting agreement.  Dominican Agent D did not render any legitimate services to Embraer relating to the sale of Super Tucano aircraft in the Dominican Republic.

33.     On May 24, 2010, Embraer RL wired $2.5 million from its New York bank account to a bank account in Uruguay belonging to Dominican Agent D.  On June 25, 2010, Embraer RL also wired $920,000 from its New York bank account to a bank account in Uruguay belonging to Dominican Agent D.  These payments bore no relation to any legitimate services rendered to Embraer and were intended to pay bribes to at least one government official in the Dominican Republic.

34.     Embraer mischaracterized the bribe payments as legitimate expenses in its books and records.  Embraer RL recorded the $3.42 million paid to Dominican Agent D as "Sales Commission."  The payments from Embraer RL to Dominican Agent D were consolidated into Embraer's financial statements and booked under  Operating Income (Expense) as a "Selling Expense," specifically, "Commercialization Expense."  As a result, Embraer did not, in reasonable detail, accurately and fairly reflect its payments to Dominican Agent D in its books and records.

35.     Embraer used interstate commerce to carry out the scheme.  Embraer RL wired the bribe payments from its New York bank account.  In addition, at least one email in furtherance of the scheme passed through U.S. servers.  For example, on or around October 21, 2010, the Dominican Official sent an email from a server located in the U.S. to Dominican Agent D with further payment instructions.  Specifically, the Dominican Official instructed Dominican Agent D to wire the funds Embraer RL remitted to Dominican Agent D to a nominee account located in Panama for further credit to a company domiciled in the Dominican Republic and a bank account held in the Dominican Republic.

**B.     Embraer's Illegal Payments in Saudi Arabia**

36.     From November 2009 through February 2011, Embraer, through its employees

and agents, agreed to pay, and did pay, an official of the government of Saudi Arabia to obtain a contract for the sale of private jets valued at approximately $93 million.

37.     In or around 2007, Embraer learned that a Saudi Arabian state-owned enterprise was interested in purchasing three used executive jets to replace some of its aging aircraft. Employees of this Saudi state-owned enterprise are "foreign officials" as the term is defined in the FCPA, 15 U.S.C. § 78dd-1(f)(l)(A).

38.     In November 2009, an executive of the Saudi state-owned enterprise ("Saudi Arabia Official") told a then-senior Embraer executive in the Executive Jets division that he could convince the Saudi state-owned enterprise to purchase three new executive jets from Embraer in exchange for an agent agreement that would pay the Saudi Arabia Official a commission based on that sale.  The sale of these aircraft to the Saudi state-owned enterprise did not involve a public tender or bid.

39.     In December 2009, a then-senior Embraer executive in the Executive Jets division met with the Saudi Arabia Official to negotiate the terms of the Saudi Arabia Official's compensation, despite knowing that the Saudi Arabia Official was an employee at the Saudi state-owned enterprise.  The senior Embraer executive and the Saudi Arabia Official agreed to a commission of $550,000 per aircraft sold to the Saudi state-owned enterprise, or a total compensation of $1.65 million.

40.     During the relevant time period, other senior Embraer executives were informed of the negotiations with the Saudi Arabia Official and approved the compensation for the Saudi Arabia Official.  Company emails to, from, or between these Embraer employees indicate that the Saudi Arabia Official requested an agent agreement, rejected an initial offer of $200,000 per aircraft as commissions, and demanded a higher commission given the total value of the contract

(about $90 million) and the additional lobbying the Saudi Arabia Official would have to do in order to influence others at the Saudi state-owned enterprise to facilitate the sale of three new executive jets.

41.     By December 17, 2009, senior Embraer executives approved a proposal to pay the Saudi Arabia Official $550,000 for each aircraft sold to the Saudi state-owned enterprise.

42.     A then-senior Embraer executive arranged to have the bribes intended for the Saudi Arabia Official flow through a South African company whose principal the employee knew personally.  Using the South African company as a conduit also allowed Embraer's employees involved in this scheme to circumvent two internal controls at Embraer: the prohibitions at Embraer against a) making payments to third parties at bank accounts located in jurisdictions the Company considered tax havens, and b) making payments directly to individual employees of a customer.

43.     On February 26, 2010, Embraer executives, including the same senior legal executive who was involved in the Dominican Republic bribery scheme, approved the selection of the South African company as the agent in the transaction with the Saudi state-owned enterprise.  On March 5, 2010, Embraer RL executed a consulting agreement with the South African company, and the senior Embraer legal executive signed it on behalf of Embraer RL. There was no business justification for using the South African company as an agent given its lack of qualifications.

44.     In May 2010, Embraer finalized the purchase agreement with the Saudi state-owned enterprise's U.S.-based subsidiary for the purchase of three new E170s (70-passenger executive aircraft) valued at approximately $93 million.

45.     On December 12, 2010, after the aircraft were delivered to the Saudi state-owned

enterprise, the South African company used as the conduit for the bribes to the Saudi Arabia

Official submitted three false invoices for $550,000 each to Embraer RL.  These invoices were

false because the South African company did not render to Embraer any legitimate services in

Saudi Arabia or elsewhere.

46.     On December 22, 2010, Embraer RL wired $550,000 from its New York bank

account to a bank account held in the name of the South African company.  On February 18,

2011, Embraer RL wired $1,100,000 from its New York bank account to a bank account held in

the name of the South African company.  These payments bore no relation to any legitimate

services rendered in Saudi Arabia and were intended to pay bribes to foreign government

officials.

47.     Embraer RL mischaracterized the payments to the South African company in its

books and records as "Sales Commission."  The payments from Embraer RL to the South

African company were consolidated at the parent level under Operating Income (Expense) as a

"Selling Expense," specifically, "Commercialization Expense – Sales Commission."  As a result,

Embraer did not, in reasonable detail, accurately and fairly reflect its payments to the South

African company in its books and records.

48.     The South African company was nothing more than a conduit for the bribes

Embraer paid to employees of the Saudi state-owned enterprise.  On February 2, 2011, the South

African company wired $500,000 to a bank account located in Geneva, Switzerland.  On March

8, 2011, and April 5, 2011, the South African company wired $500,000 and $434,100,

respectively, to a bank account located in Saudi Arabia.  These bank accounts were held in the

name of the father of an employee of Saudi state-owned enterprise who was a close associate of

the Saudi Arabia Official.  The stated purpose for these three outgoing wire transfers was "agent

fee" or "commission and consulting" relating to Embraer's sale of aircraft to the Saudi state-owned enterprise.

### C.   <u>Embraer's Illegal Payments in Mozambique</u>

49.     From approximately May 2008 through at least September 2009, Embraer, through its employees and agents, paid a consultant with ties to officials in the government of Mozambique to obtain a contract valued at approximately $65 million.

50.     In or around May 2008 through at least September 2008, Embraer negotiated the sale of two commercial aircraft to a state-owned commercial airline in Mozambique ("Mozambican state-owned enterprise").  Employees of the Mozambican state-owned enterprise are "foreign officials" as the term is defined in the FCPA, 15 U.S.C. § 78dd-1(f)(l)(A).

51.     Embraer, through its subsidiary and employees, submitted a formal proposal to the Mozambican state-owned enterprise on or around May 21, 2008, for the sale of two aircraft with certain options for approximately $65 million.  Embraer employees and the Mozambican state-owned enterprise's officials continued negotiations through September 2008.

52.     On or around August 13, 2008, about one month before the purchase agreement with the Mozambican state-owned enterprise was signed, a Mozambique national (the "Mozambican Agent") told at least one senior Embraer employee that Embraer should make  a "gesture" to unidentified officials in the government of Mozambique when delivering the first aircraft.  The Embraer employees involved with the Mozambican state-owned enterprise negotiations believed the Mozambican Agent to be well connected with officials in the government of Mozambique.

53.     The Mozambican Agent did not have any legitimate role in the ongoing Mozambican state-owned enterprise negotiations.  Instead, he appeared to be acting as a

middleman or agent for the government officials involved in the deal, and Embraer employees believed they needed to pay the Mozambican Agent in order to win the contract.

54.     Senior executives at Embraer approved an offer to the Mozambican Agent of between $50,000 and $80,000 per aircraft sold to the Mozambican state-owned enterprise even though the Mozambican Agent had not rendered any legitimate services to Embraer during the negotiations with the Mozambican state-owned enterprise.  It became clear to Embraer employees that Embraer's "gesture" was too low.  Less than two weeks later, on or around August 25, 2008, the Mozambican state-owned enterprise's then chief executive officer, a foreign government official at the time as that term is defined by the FCPA (the "Mozambican Official"), called an Embraer sales employee and suggested that a $1 million "gesture" to the Mozambican Agent would be appropriate, but that Embraer could "get away' with paying only $800,000.  The Mozambican Official also threatened to torpedo the ongoing negotiations with Embraer by giving a competing bid priority over Embraer's bid.

55.     On or around September 15, 2008, Embraer and the Mozambican state-owned enterprise executed the purchase agreement for the sale of two E190 aircraft for approximately $65 million.  The Mozambican Official was one of three Mozambican state-owned enterprise executives who signed the purchase agreement on behalf of the Mozambican state-owned enterprise.

56.     On or around April 22, 2009, Embraer's U.S.-based subsidiary, Embraer RL, executed a consulting agreement with a company based in the Democratic Republic of São Tomé and Príncipe that the Mozambican Agent controlled and which had only been incorporated in or about November 2008 (the "Mozambican Consultant").  The agreement authorized the Mozambican Consultant, among other things, to promote sales of the E190 "solely and

specifically" to the Mozambican state-owned enterprise even though the sale of such aircraft had been completed seven months prior to the execution of this agreement and the Mozambican Consultant had not even been formed at the time the Mozambican state-owned enterprise purchase agreement was signed.  The agreement with the Mozambican Consultant stated the Mozambican Consultant's promotion efforts began in or about March 2008.

57.     Pursuant to the consultant agreement with the Mozambican Consultant, Embraer RL agreed to pay $400,000 per aircraft, or $800,000 (the amount the Mozambican Official had previously indicated to at least one Embraer employee was appropriate).  There is no evidence that the Mozambican Agent or the Mozambican Consultant rendered any legitimate services to Embraer in Mozambique.  Two senior Embraer executives signed the agreement on behalf of Embraer RL, including a senior Embraer legal executive and an executive vice president.  The Mozambican Agent who had initially proposed the bribe payment as a "gesture" signed the consulting agreement on behalf of the Mozambican Consultant.

58.     Embraer delivered the aircraft to the Mozambican state-owned enterprise on or around July 30, 2009, and September 2, 2009.  The Mozambican Consultant submitted two invoices addressed to Embraer RL dated August 15, 2009, and September 24, 2009, respectively, each for $400,000.  These invoices were false invoices because the Mozambican Consultant did not render to Embraer any legitimate services in Mozambique or elsewhere.  An Embraer executive signed and approved both invoices for payment.

59.     On August 31, 2009, Embraer RL wired $400,000 from its U.S.-based Citibank account to a bank account in Portugal in the name of the Mozambican Consultant.  Embraer RL again wired $400,000 from its Citibank bank account to the Mozambican Consultant's Portugal bank account on October 2, 2009.  These payments bore no relation to any legitimate services

rendered in Mozambique and were bribes to foreign government officials.

60.     Embraer RL mischaracterized these payments as "Sales Commission" in its books and records.  The payments from Embraer RL to the Mozambican Consultant were consolidated at the parent level under Operating Income (Expense) as a "Selling" expense, specifically, "Sales Commission."

### D.     Embraer's Accounting Scheme in India

61.     On July 3, 2008, Embraer executed a contract to develop three highly-specialized military aircraft for the Indian Air Force for approximately $208 million.  As in the Dominican Republic, Saudi Arabia, and Mozambique transactions, Embraer paid an Indian national ("the Indian Consultant"), who assisted Embraer obtain this defense contract, through an intermediary in order to conceal the true nature of the payments, which were in violation of Indian law.

62.     Embraer's employees understood that India prohibited the use of commercial agents for military sales.  For that reason, in January 2005 Embraer executed a consulting agreement with a company domiciled in the UK (the "UK Entity"), which had a relationship with the Indian Consultant.  Even though the Indian Consultant was not mentioned in this consulting agreement, internal emails indicate that employees at Embraer knew that this entity was affiliated with the Indian Consultant.

63.     The executed agreement was stored in a safe deposit box in London that could only be opened by the simultaneous use of a key maintained by Embraer's legal department and a card key in the possession of a representative of the UK Entity.  Less than a month after executing this agreement, on February 8, 2005, Embraer announced that it had signed a memorandum of understanding with India's Defence, Research and Development Organisation ("DRDO").

64.     Embraer's agreement with the UK Entity had expired by the time Embraer executed the purchase agreement with India's DRDO in July 2008, but the Indian Consultant, through counsel, claimed a commission related to that contract.  From February 2009 through July 2009, Embraer negotiated, and ultimately approved, a $5.76 settlement with the Indian Consultant.  On November 21, 2009, Embraer's wholly-owned Swiss subsidiary, Embraer AG, through senior Embraer executives, executed a consulting agreement with a company domiciled in Singapore (the "Singapore Entity").

65.     Pursuant to that agreement, Embraer AG authorized the Singapore Entity to promote the sale of two Embraer aircraft to an unrelated customer in Austria, which was a way to conceal that the consulting services were in fact for the Indian Consultant's work in India. Embraer AG further agreed to pay the Singapore Entity a commission of $2.88 million per aircraft (or $5.76 million in total, the amount Embraer agreed to pay the Indian Consultant) in exchange for vaguely-described marketing services.

66.     On January 5, 2010, January 19, 2010, and February 4, 2010, Embraer AG transferred $1.920 million (or $5.76 million in total) from its Swiss-based investment account to the Singapore Entity's bank account in Singapore.

67.     Embraer, through Embraer RL's bank account in New York, transferred to Embraer AG's account the funds ultimately remitted to the Singapore Entity.  Embraer AG's payments to the Singapore Entity were recorded and the accounting entries for these transactions indicate that the payments to the Singapore Entity were made "on behalf of Embraer RL."  The intercompany transfers from Embraer RL to Embraer AG impacted Embraer's "Accounts Receivable – Intercompany" and "Operating Income – Intercompany" accounts.   The payments to the Singapore Entity were consolidated at the parent level under Operating Income (Expense)

and mischaracterized as a "Selling Expense," specifically, under "Commercialization Expense."

68.     The payments to the Singapore Entity were a way for Embraer to pay the Indian Consultant, and to conceal in its books and records that it was paying for consulting work in India.  As a result, Embraer did not, in reasonable detail, accurately and fairly reflect its payments to the Singapore Entity in its books and records.

### E.     Failure to Maintain Adequate Internal Controls

69.     Embraer failed to devise and maintain an adequate system of internal accounting controls.  During the relevant time period, Embraer's policies, procedures, or controls required that all commitments above a certain sum with third parties have a formal, written contract.  However, Embraer did not enter into a written contract with the Dominican Official, the Saudi Arabian Official, the Mozambican Official, or the Indian Agent even though these individuals were the intended beneficiaries of the payments referred to in this complaint.  Similarly, Embraer's code of ethics and internal company directives required due diligence on sales representatives or agents, such as checking corporate documentation and publicly available information, gathering evidence of access to the customer or market, and inquiring whether the representative or agent was recommended by government officials.  In each of the schemes described in this Complaint, the bribes and improper payments involved were transacted through third parties.  Critical steps that Embraer's internal process at the time required, such as checking publicly available information about the third parties' access to customers or relevant markets, were either ignored or circumvented.  The information obtained, had these steps been taken, would have alerted Embraer employees that some or all of the agents identified in this Complaint lacked any experience or expertise in the aviation industry or access to the relevant markets in question.

70.     Lastly, Embraer's legal department was responsible for approving the consultants its senior legal executive engaged on behalf of ERL.  As a result, senior Embraer executives in Brazil, including a senior legal executive at the time, at least two other senior Embraer executives, and several Embraer managers, circumvented the Company's internal accounting controls by, among other things, approving the engagement of third parties through sham contracts to act as conduits for bribes to foreign officials, and concealing bribe payments as legitimate expenses under contracts obtained in countries that bore no relation to any legitimate services rendered and that were intended largely to pay bribes to foreign government officials.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violations of Section 30A of the Exchange Act**

71.     Paragraphs 1 through 70 are re-alleged and incorporated by reference.

72.     As described above, Embraer, through its officers, directors, employees, or agents corruptly offered, promised to pay, or authorized unlawful payments to one or more persons, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violation of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist Embraer in obtaining or retaining business.

73.     By reason of the foregoing, Embraer violated the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. § 78dd-1].

## SECOND CLAIM

### Violations of Section 13(b)(2)(A) of the Exchange Act

74.     Paragraphs 1 through 70 are re-alleged and incorporated by reference.

75.     As described above, Embraer, through its officers, agents, subsidiaries, and affiliates, failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

76.     By reason of the foregoing, Embraer violated the books-and-records provisions of the FCPA, as codified at Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## THIRD CLAIM

### Violations of Section 13(b)(2)(B) of the Exchange Act

77.     Paragraphs 1 through 70 are re-alleged and incorporated by reference.

78.     As described above, Embraer, through its officers, directors, employees, or agents acting on its behalf, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for its assets.

79.     By reason of the foregoing, Embraer violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.     Permanently enjoining Embraer from violating Sections 30A, 13(b)(2)(A), and

13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78dd-1; 78m(b)(2)(A) and (B)]; and

      B.      Ordering Embraer to disgorge ill-gotten gains, with prejudgment interest, wrongfully obtained as a result of its illegal conduct.

      C.      Granting such further relief as the Court may deem just and appropriate.

      D.      Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated:   October 24, 2016          Respectfully submitted,

                           *s/Andrew O. Schiff*
                           Andrew O. Schiff
                           Regional Trial Counsel
                           S.D. Fla. No. A5501900
                           Direct Dial: (305) 982-6390
                           E-mail: schiffa@sec.gov

                           *s/Ernesto Palacios*
                           Ernesto Palacios
                           Senior Counsel, FCPA Unit
                           Florida Bar No. 0529168
                           Direct Dial: (305) 982-6306
                           E-mail: palaciose@sec.gov

                           Attorneys for Plaintiff
                           **SECURITIES AND EXCHANGE COMMISSION**
                           801 Brickell Avenue, Suite 1800
                           Miami, Florida 33131
                           Telephone: (305) 982-6300
                           Facsimile: (305) 536-4154

Of Counsel:
Thierry Olivier Desmet
Assistant Director, FCPA Unit
U.S. Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida  33131

22